# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 14-1219V
Filed: July 27, 2016

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | **PUBLISHED** |
| JULIE MOUNTS, o/b/o and as next friend for M.M., | * * * | Special Master Hamilton-Fieldman |
| Petitioner, | * * | Attorneys' Fees; reasonable basis; recovery of fees by unsuccessful petitioner. |
| v. | * * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * * * * | |
| Respondent. | * | |
| * * * * * * * * * * * * | | |

Verne E. Paradie, Jr., Paradie, Sherman, Walker & Worden, Lewiston, ME, for Petitioner.
Christine M. Becer, United States Department of Justice, Washington, DC, for Respondent.

## ATTORNEYS' FEES AND COSTS DECISION[1]

      Julie Mounts ("Petitioner") petitioned for compensation on behalf of her daughter, M.M., under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 (2012) ("Vaccine Act"). Pet., ECF No. 1. Petitioner alleged that M.M. suffered from chronic urticaria and chronic idiopathic hives because she received the Varicella; Diphtheria, Tetanus, and Pertussis ("DTap"); and Meningococcal vaccines. Pet. at 1. On Petitioner's motion, the undersigned ultimately dismissed the petition for insufficient proof. Decision, ECF No. 45.

---

[1] Because this decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this decision on the website of the United States Court of Federal Claims, in accordance with the purposes espoused in the E-Government Act of 2002. *See* 44 U.S.C. § 3501 (2012). Each party has 14 days to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b).

Petitioner now moves for attorneys' fees and costs in the amount of $8,746.48. Mot. for Attorney Fees at 1, ECF No. 48 (hereinafter "Mot."). Respondent objects, arguing that Petitioner lacked a reasonable basis for pursuing the petition. *See generally* Resp. to Mot., ECF No. 50 (hereinafter "Resp."). After reviewing the record in this case, the undersigned agrees with Respondent and therefore declines to award attorneys' fees and costs.

### I.     Factual Background

For most of her life preceding the vaccination, M.M. was healthy, albeit with a significant history of asthma-related concerns. Pet'r's Ex. 2 at 11.[2] At a 12-year-old well-child visit on May 23, 2012, M.M. received the Varicella, DTap, and Meningococcal vaccines. *Id.*

In an affidavit, Petitioner attested that M.M. "complained of what appeared to be a chicken pox outbreak" later that same evening. Pet. at 5. Petitioner also recalled contacting M.M.'s physician, who "explained that the symptoms were likely a side effect of the vaccinations and that [M.M.] would be fine." *Id.* Over the next few months, Petitioner remembered, "M.M. suffered intermittent bouts of shakiness, chest pains, and hyperventilating," and had long periods of inexplicable agitation and unusual sleepiness. *Id.* at 6. All that being said, M.M.'s medical records document neither an outbreak, a phone call to her physician, nor any of these other symptoms, and M.M.'s next recorded medical visit did not occur until October 26, 2012, when she visited the emergency room due to a volleyball-related concussion. Pet'r's Ex. 4 at 25. Other than nausea and a headache, an examination revealed no abnormalities. *Id.* at 39. Her physician discharged her on the same day. *Id.* at 43. At a follow up with Dr. Richard Redington one week later, M.M. reported that her headaches had ceased and an examination showed that she was otherwise normal. Pet'r's Ex. 7 at 2, ECF 30-1. There was no mention of any skin condition.

Two weeks later, on November 16, M.M. returned to Dr. Redington for a sore throat, upper respiratory infection, and cough. *Id.* at 3. Dr. Redington performed a Strep Test, which was positive, and prescribed her antibiotics. *Id.* Again, Dr. Redington's notes reveal no observed skin condition.

Nearly two months later, and almost ten months after the vaccines, on January 10, 2013, M.M. revisited Dr. Redington, complaining that, for the past three days, she endured a rash on her face, sore throat, fever, and cough. *Id.* M.M. tested negative for both Strep Throat and the Flu. *Id.*

---

[2] For those exhibits filed via compact disc, the undersigned provides no ECF designation.

On January 21, M.M. returned to Dr. Redington, explaining that she "sleeps all the time," is "not eating," "seems depressed," and suffered headaches since she was hit on her head by her cousin two months earlier (apparently in an incident unrelated to the volleyball concussion). *Id.* at 4. Dr. Redington observed that M.M. had a flat affect, and prescribed her Pristiq for depression. *Id.*

Almost four weeks later, on February 13, M.M. traveled to Dr. Redington because her condition had not markedly improved. *Id.* at 5. In addition to the fatigue and depression, she also complained of shakes, headaches, hyperventilation, and abdominal pain. *Id.* Dr. Redington noted that M.M. was "very upset" over a "schism" with her "best friend." *Id.* In the end, Dr. Redington diagnosed M.M. with chronic anxiety, depression, vague somatic complaints, and anxiety attacks. *Id.* Going forward, he planned to continue her medication, get labs, encourage more sleep, and consider counseling. *Id.* Two days later, lab tests showed no H. pylori antibodies and a normal complete blood count, metabolic panel, urinanalysis, and thyroid panel. *Id.* at 9-12.

Over five months after this visit, on July 23, M.M. returned to Dr. Redington because she was covered in hives, which (he noted) first appeared one week earlier. *Id.* at 6. Dr. Redington assessed that the hives were probably due to stress, and prescribed a prednisone taper. *Id.*

On August 7, M.M. visited an allergist, Dr. Laurie, due to the hives. Pet'r's Ex. 1 at 6. Dr. Laurie noted that M.M. had "a history of urticaria," but that "[h]er symptoms began three weeks ago, when she was in her usual state of health." *Id.* Ultimately, Dr. Laurie concluded, M.M. "has acute urticaria and angioedema," which "at this point [is] likely idiopathic." *Id.* at 8. He planned to start her on Zyrtec. *Id.* at 9. Five days later, on August 12, M.M. went to the Emergency Room for treatment of hives which, the treating physician observed, began three weeks earlier. Pet'r's Ex. 4 at 5-18. She was diagnosed with chronic diffuse urticaria of unknown etiology; and was given Prednisone, Zyrtec, and Benadryl. *Id.*

Less than ten days after her trip to the E.R., M.M. saw Dr. Arkusinski, a primary care physician, for her hives and a cough. Pet'r's Ex. 2 at 9-10. He examined her, but found neither skin lesions nor a rash. *Id.*

On September 4, M.M. returned to Dr. Laurie, explaining that her symptoms still presented, but that Zyrtec controlled them 98% of the time. Pet'r's Ex. 1 at 17-18.

She again visited Dr. Arkunsinski on September 20 and complained of a headache and vomiting. *Id.* at 7. He diagnosed her with a migraine. *Id.* The next month, he treated her for angioedema and referred her to another allergist for a second opinion regarding her hives. *Id.* at 5.

On October 21, Dr. Webb evaluated M.M.'s hives. Pet'r's Ex. 3 at 2-5. He noted that M.M. "reports that her symptoms first appeared approximately 3 months ago." *Id.* at 2. He too diagnosed her with idiopathic urticaria. *Id.* at 5. M.M. returned to Dr. Webb on January 7, 2014, with throat swelling, cough, and hives; and Dr. Webb prescribed her prednisone. *Id.* at 11-13.

About three weeks later, on January 27, M.M. visited the E.R., complaining of intermittent hives since July 2013, as well as a battery of other symptoms. Pet'r's Ex. 5 at 3. The differential diagnosis was as follows: "Rheumatologic disorder vs. SLE vs. Migraine vs. Pseudotumor cerebri vs. Allergic disorder secondary to unknown trigger." *Id.* at 7. Physicians discharged M.M. on the same day. *Id.*

A little more than one week afterward, on February 5, Dr. Bird, an allergist and immunologist, evaluated M.M. Pet'r's Ex. 2 at 32. Dr. Bird noted that M.M.'s hives began in July 2013. *Id.* Lab tests returned normal results and he ordered her to continue taking Zyrtec. *Id.* at 30-31, 35.

On July 26 of that year, M.M. visited Dr. Gotte, a rheumatologist, for additional evaluation. Pet'r's Ex. 2 at 26. Dr. Gotte wrote that M.M.'s hives outbreaks began in January 2013. *Id.* At this visit, her examination revealed no abnormalities, and Dr. Gotte explained that M.M. likely has "idiopathic chronic urticaria," and that "many of her more vague constitutional complaints are secondary manifestations from the stress associated with her urticaria and perhaps exacerbated by intercurrent self-limited infections." *Id.*

M.M.'s most recent documented medical visit occurred on March 6, 2014, when she visited Dr. Arkusinski for a fever and sore throat. *Id.* at 2-3. He prescribed her Tamiflu. *Id.*

## II.   Procedural History

As previously stated, on December 22, 2014, Petitioner filed the instant petition on behalf of M.M. *See generally* Pet. Petitioner alleged that M.M. developed chronic urticaria and the aforementioned related symptoms as a result of the Varicella, DTaP, and Meningococcal vaccines she received on May 23, 2012. Pet. at 1.

No medical records accompanied the petition. The undersigned initially ordered that all medical records be filed by February 2, 2015. Initial Order at 1, ECF No. 5.

On January 30, Petitioner requested an additional 30 days in which to file medical records, noting simply that "Petitioner's medical records are substantial" and that despite "gathering and organizing the records," Counsel required another 30 days to "complete those

4

records." Mot. for Extension of Time at 1, ECF No. 8. The undersigned granted Petitioner's motion, moving the deadline to March 4. Order Granting Mot. for Ext. of Time, ECF No. 9.

One day before the deadline, Petitioner again moved for an additional 30 days in which to file medical records, explaining that Counsel had "obtained and filed[3] some of Petitioner's records, but needs an additional 30 days to complete those records." Second Mot. for Extension of Time at 1, ECF No. 10. The undersigned again granted Petitioner's motion, moving the deadline to April 2. Order Granting Pet'r's Mot. for Extension of Time, ECF No. 11.

On the day of the deadline, Petitioner moved for a third extension, requesting that she be given until April 9 to file medical records, indicating that Petitioner recently received the final outstanding medical records, but that Petitioner needed to peruse the records and redact the necessary information before filing them. Unopposed Mot. for Extension of Time at 1, ECF No. 12. The undersigned granted Petitioner's motion, moving the deadline to April 9. Order Granting Mot. for Extension of Time, ECF No. 13.

On April 6, the undersigned received the first set of medical records from Petitioner via compact disc. *See* Unnumbered CM/ECF Entry dated Apr. 6, 2015. On April 24, Respondent noted the existence of additional outstanding medical records. Status Report (Apr. 24, 2015) at 1, ECF No. 16. The undersigned ordered that all such records be provided by May 26, 2015. Scheduling Order (Apr. 27, 2015) at 1, ECF No. 17.

Almost one week after the deadline, on June 2, the undersigned's law clerk reached out to Petitioner's counsel, noting that the deadline for filing the aforementioned medical records had passed. See Unnumbered CM/ECF Entry dated June 2, 2015. Petitioner then moved for a 30-day extension of time in which to file these medical records, explaining, "Petitioner's physician during this time period is now retired, making it more difficult to obtain his records." Mot. for Extension of Time at 1, ECF No. 18. The undersigned granted Petitioner's motion, extending the deadline to July 2. Order Granting Pet'r's Mot. for Extension of Time at 1, ECF No. 19.

Five days after the deadline, Petitioner filed a status report again noting that M.M.'s pediatrician, Dr. Lee, had retired and that Petitioner had been unable to locate records predating 2009. Status Report (July 7, 2015) at 1, ECF No. 22. Petitioner requested a status conference. *Id.*

On July 21, the undersigned held a status conference. Scheduling Order (July 21, 2015) at 1, ECF No. 23. During the conference, Respondent explained that she was satisfied with the records predating 2009, but expressed concern at the lack of records postdating M.M.'s

---

[3] Despite her representation to the contrary, Petitioner had not yet actually filed any medical records.

vaccination. *Id.* The undersigned ultimately ordered Petitioner to file an amended statement of completion, or a status report specifying when all outstanding medical records would be filed, by August 4. *Id.*

On August 4, Petitioner filed a status report noting that Counsel had just learned—for the first time—the name of M.M.'s treating physician during the year postdating her vaccination. Status Report (Aug. 4, 2015) at 1, ECF No. 26. Petitioner requested 45 days in order to file records from that pediatrician. *Id.* The undersigned granted Petitioner's request, ordering that all outstanding records be filed by September 15. Scheduling Order (Aug. 4, 2015) at 1, ECF No. 27. On that day, Petitioner filed medical records from Dr. Redington, the aforementioned pediatrician, as well as another statement of completion. *See* Statement of Completion (Sept. 15, 2015), ECF No. 32.

Following this, on November 23, Respondent filed a Vaccine Rule 4(c) Report, arguing that Petitioner was not entitled to compensation under the Vaccine Act. Respondent's Report, ECF No. 34. Specifically, Respondent contended that Petitioner could not connect any of M.M.'s injuries to her vaccinations, noting that her headaches did not occur until five months after the vaccination, her depression until six to seven months, and her hives until fourteen months. *Id.* at 6. Respondent also pointed out that none of M.M.'s treating physicians believed that the vaccinations were a potential cause of her condition. *Id.*

The undersigned then conducted another status conference, expressing concern about the timing of the onset of Petitioner's alleged injury. Scheduling Order (Dec. 8, 2015) at 1, ECF No. 35. Petitioner again requested more time to locate additional medical records, and the undersigned ordered that all such records be filed by January 19, 2016. *Id.* That day, Petitioner filed additional medical records, and the undersigned set another status conference. *See* Unnumbered Status Conference Order dated Feb. 2, 2016.

At that status conference, on February 4, the undersigned and Respondent continued to express concern about the viability of Petitioner's claim, in light of the issues regarding the onset of M.M.'s condition. Scheduling Order (Feb. 4, 2016) at 1, ECF No. 40. Petitioner's Counsel requested time to consult with his client, and the undersigned outlined Petitioner's options for exiting the Program. *Id.*

On March 25, Petitioner filed an unopposed motion to dismiss her petition, citing an inability to prove that she was entitled to compensation. Unopposed Mot. for Decision to Dismiss Pet. at 1, ECF No. 44. The undersigned summarily granted Petitioner's motion. Decision, ECF No. 45.

Petitioner now moves for attorneys' fees and costs, asserting that she filed the petition in good faith and that she possessed a reasonable basis for pursuing the claim. Mot. at 2-5. Counsel avers that when he filed the petition, he believed that he would shortly obtain medical records supporting Petitioner's recollection—that the first symptom of M.M.'s condition occurred the night following the vaccination, with the full battery of symptoms appearing within a few months. Mot. at 3. Counsel also opines that he obtained "whatever records were available" and spoke "at length with M.M.'s mother and father regarding her immediate onset of symptoms she had never experienced before the vaccinations." Mot. at 4. Counsel acknowledges that M.M.'s medical records were not immediately available, but blames her physician's retirement for the delay in obtaining these records. Mot. at 4.

By contrast, Respondent argues that Petitioner lacked a reasonable basis for filing the petition. Resp. at 7-8. In particular, Respondent points out, Petitioner's medical records document no symptoms of Petitioner's injury prior to January 2013, despite Petitioner's attestations to the contrary. *Id.* at 7. Respondent recognizes Petitioner's difficulty obtaining those medical records, but notes that Petitioner filed the petition months before the close of the statute of limitations and could have waited to procure those records instead of rushing to seek compensation. *Id.* at 7 n.3.

In reply, Petitioner contends that a reasonable basis existed to pursue her claim because (a) M.M.'s allergist, in August of 2013, opined that M.M.'s urticaria was likely idiopathic, (b) Petitioner represented that M.M.'s symptoms began the night of the vaccination, and (c) of Counsel's "involvement in another urticaria case where the petitioner's urticaria was considered idiopathic." Reply to Resp. to Mot. at 2, ECF No. 51. Counsel also explains that, consistent with a questionnaire and Petitioner's affidavit, he believed that "the allergist's notation that M.M.'s symptoms started three weeks prior to his visit with M.M." referenced the most recent flare up of symptoms, not their inception. *Id.* Further, Counsel observes, parents often delay seeking treatment for urticaria-like symptoms. *Id.* Finally, Counsel notes that none of his fee applications under the Vaccine Act have ever been denied. *Id.*

### III.   Analysis

A special master must award reasonable fees and costs to a petitioner who receives compensation under the Vaccine Act. 42 U.S.C. § 300aa-15(e)(1) (2012). Although not required to do so, the special master may also award reasonable fees and costs to an unsuccessful petitioner, so long as the petitioner (1) filed the petition in good faith and (2) had a reasonable basis for the claim. *Id.*

Of note, the Vaccine Act does not *compel* the special master to make an award to every petitioner who meet these requirements; rather, Congress vested the special master with

discretion and "plainly contemplat[ed] that not all petitioners would recover fees and costs." *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014). To be sure, the special master's discretion is tempered by the remedial nature of the Vaccine Act, which necessitates liberally construing its provisions to effectuate its ultimate goal: "to award compensation to vaccine-injured persons quickly, easily, and with certainty and generosity." *Cloer v. Sec'y of HHS*, 675 F.3d 1358, 1362 (Fed. Cir. 2012) (internal quotation marks omitted).

With regard to the good faith requirement, the Court of Federal Claims has observed that petitioners "are entitled to a presumption of good faith." *Grice v. Sec'y of HHS*, 36 Fed. Cl. 114, 121 (1996). In other words, when there is no "direct evidence of bad faith," the special master is justified in finding that Petitioner has met the good faith requirement. *Id.*[4]

As to the existence of a reasonable basis for filing the claim, the Vaccine Act "grants to the special master maximum discretion in applying the standard." *Silva v. Sec'y of HHS*, 108 Fed. Cl. 401, 402 (2012). Functionally, "reasonable basis is an objective standard determined by the totality of the circumstances." *Chuisano*, 116 Fed. Cl. at 286. Although insusceptible to precise definition, a petitioner attempting to meet this standard faces a burden that "is something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Id.* at 287.

In determining whether petitioners possessed reasonable bases to pursue their claims, special masters have often considered the degree to which the relevant attorney investigated the feasibility of the claim and have denied fee applications where the investigation proved lackluster. *See, e.g., Chuisano v. Sec'y of HHS*, No. 07-452V, 2013 U.S. Claims LEXIS 1868 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), *aff'd*, 116 Fed. Cl. 276; *Silva v. Sec'y of HHS*, No. 10-101V, 2012 U.S. Claims LEXIS 825 (Fed. Cl. Spec. Mstr. June 22, 2012), *aff'd*, 108 Fed. Cl. 401. In *Chuisano*, the Court of Federal Claims affirmed Special Master Moran's decision denying the petitioner's fee application, where the petitioner approached counsel two years before the filing date, and in the medical records, all of the treating physicians opined that the petitioner's injury resulted from unrelated causes. 108 Fed. Cl. at 290-91. The Court did the same in *Silva*, where the petitioner approached counsel 17 months before the filing date, the MRIs showed no abnormalities, and none of petitioner's treating physicians believed that the injury was vaccine related. *See Silva*, 103 Fed. Cl. at 403-05. Therein, the Court observed that the Vaccine Act "contemplates . . . a simple review of available medical records to satisfy the attorneys that the claim is feasible." *Silva*, 103 Fed. Cl. at 403-05.

---

[4] Because Respondent presents no direct evidence of bad faith, the undersigned finds that Petitioner satisfied the good faith requirement and will not further discuss the matter.

After reviewing the record, the undersigned finds that Petitioner lacked a reasonable basis for pursuing her claim under the Vaccine Act. At the time of filing, Petitioner had no medical records supporting her attestation that M.M.'s symptoms arose on the night of the vaccination. Now, medical records show that five different physicians[5] observed Petitioner's symptoms beginning in July 2013, with one suggesting January of 2013. Instead of filing the petition while resting on his belief that M.M.'s medical records would support Petitioner's memories, Counsel should have actually sought out the medical records beforehand. Had he done so, it would have been clear that Petitioner had no reasonable basis for pursuing a claim, as M.M.'s injury did not arise until at least eight months after her vaccination, at the very earliest (and more likely over a year after the vaccination).

Counsel claims that he did consult M.M.'s medical records, but this is curious, as no medical records accompanied the petition and none were filed until almost four months after the petition was filed. It was not until shortly before the status report of August 4, 2015 was filed (after Respondent had brought the missing records to his attention), that Counsel first learned the name of M.M.'s post-vaccination treating physician. Counsel attempts to shift blame to M.M.'s physician's retirement, but this too is curious, as Counsel moved to extend the filing deadline for medical records four times and never once mentioned that the physician's retirement was the reason for the delay.[6] In a last ditch effort to justify the hurried filing, Counsel cites the impending statute of limitations; however, the statute of limitations did not expire for at least five full months before the filing date, giving Counsel plenty of time to further investigate M.M.'s medical history before filing the petition. Indeed, Counsel filed a number of medical records with the Court within that five month period, all of which undermine his argument that the claim was supported by a reasonable basis.

Counsel's other arguments in favor of reasonable basis are likewise meritless. Initially, that M.M.'s allergist opined that her urticaria was "idiopathic," in no way creates reasonable

---

[5] Counsel argues that he interpreted one of these physician's notations to refer to a recent flare-up, rather than the origin of the condition, but that argument fails to move the proverbial needle for a number of reasons. First, it still leaves four other physicians opining that that condition arose in July 2013. It also strains credulity, as the allergist contrasted the beginning of symptoms with M.M.'s "usual state of health," and were this to refer merely to a recent flare-up of an ongoing condition, one presumes that the flare-up would be consistent with M.M.'s "usual state of health." Finally, the argument does not create a reasonable basis for the claim; rather, it merely deflects additional evidence that would otherwise negate reasonable basis.

[6] Moreover, the alleged delay caused by this physician, as explained in one of Petitioner's later motions, affected the procurement of records *predating* Petitioner's vaccination; thus, they would be of little help in establishing reasonable basis in this case.

basis for the claim. Saying that the condition is idiopathic merely suggests that the allergist did not know the origin of the condition. To hold that such an opinion moves the needle toward reasonable basis would mean that petitioners have a reasonable basis to pursue a claim for every medical condition of notably unknown etiology, so long as the condition followed a vaccination. Second, that Counsel has never before had a fee application under the Vaccine Act denied is of no relevance to the undersigned's determination, as the standard for judging reasonable basis is an objective one. For similar reasons, in the absence of objective evidence establishing that urticaria claims are manifestly different from others under the Vaccine Act, the undersigned is unpersuaded by Counsel's representations that his decision to pursue this claim was based on his "involvement with another urticaria case where the petitioner's urticaria was considered idiopathic" and his knowledge that "parents often times do not seek immediate medical attention for symptoms associated with urticaria."

In sum, as in *Silva* and *Chuisano*, the undersigned finds that Petitioner lacked a reasonable basis for pursuing the petition under the Vaccine Act because it was supported by no more than Petitioner's representations, which ran directly contrary to her medical records. Accordingly, Petitioner is not entitled to an award of attorneys' fees and costs.

### IV.     Conclusion

Petitioner's motion for attorneys' fees and costs is denied. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court shall enter judgment in accordance herewith.[7]

**IT IS SO ORDERED.**

s/Lisa D. Hamilton-Fieldman
Lisa D. Hamilton-Fieldman
Special Master

---

[7] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review. Vaccine Rule 11(a).